521-0098. For the appellant, it's Christopher Seeloff. For the representative athlete, it's Michael Lennox. Both are present. You're ready to begin, Mr. Seeloff? Yes, Your Honor. Okay. You may proceed when ready. Please state your name for the record, for the recording, please. Your Honor, counsel, may it please the Court, Assistant Appellant Defender Chris Seeloff, here on behalf of the defendant appellant, Mr. Donald Nelson. On its face, this case is about whether the circuit court manifestly erred in finding Mr. Nelson guilty but mentally ill, instead of not guilty by reason of insanity. However, on a more fundamental level, this case is about whether three items of evidence, taken largely out of context and without further support, are sufficient for the State to rebut nearly a decade's worth of evidence that Mr. Nelson was legally insane at the time of the death of Elvin Williams. For the reasons that follow, as well as those in the briefing, the answer must be that Mr. Nelson was legally insane at the time he killed Elvin Williams, and he respectfully requests that this Court correct his verdict to not guilty by reason of insanity and remand his cause to the circuit court for further proceedings. In an insanity case, as in any other criminal case, the State must first prove the defendant guilty beyond a reasonable doubt of the crime charged. The burden then shifts to the defendant to prove by clear and convincing evidence that he was legally insane at the time of the crime. That is, he must prove that his mental disease or defect prevented him from appreciating the criminality of his conduct. If the defendant meets that burden, then he must be found not guilty by reason of insanity. If the fact finder believes that the defendant was suffering from a mental illness but still understood the criminality of his actions, then it may find that the defendant is guilty but mentally ill. The fact finder, in this case the circuit court at a bench trial, may rely on any confident and relevant evidence in making its determination between guilty but mentally ill and not guilty by reason of insanity. When reviewing this verdict of guilty but mentally ill instead of not guilty by reason of insanity, the trial effects verdict will not be reversed unless contrary to the manifest weight of the evidence, meaning the opposite conclusion is clearly evident where the finding is unreasonable, arbitrary, or not based on the evidence provided. The standard of view is very important here because while it is a high burden for Mr. Nelson to clear and it is an affirmative defense, the record shows that he met this burden easily at trial, and the circuit court's verdict failed to account for a sizable amount of the evidence that Mr. Nelson was legally insane at the time of Williams' death. Isn't that in the trial court's purview though? I mean, the state would even have to have had another expert if the trial court totally rejected the defense expert. Isn't that a decision the trial court makes? The trial court has the ability, Your Honor, yes, to determine which experts to believe, if any. However, there is no indication in the record here that the trial court found either expert incredible. In fact, the trial court in announcing its verdict said that it found both experts to be credible. The important question here and the argument that Mr. Nelson raised throughout his briefing before this court, and will again reiterate today, is that the stunning amount of evidence to show that he was legally insane not only at the time that he shot Elvin Williams, but for several decades beforehand as well as several days before he shot Mr. Williams and several hours after he shot Mr. Williams. The only way for the trial court to make its verdict of guilty but mentally ill instead of not guilty by reason of insanity would be to look at all of this evidence and to say for perhaps a one-hour period of time within this, say, two-decade window, Mr. Nelson suddenly popped into a moment of lucidity and in that moment decided to murder a man in cold blood because he liked the color of his car. The trial court's comment about the video where the detention officer or corrections officer told him, don't do something stupid like pick your nose, and then he looks at the camera and then finally picks his nose, the trial court made mention of that like that was one factor considered to determine his... Well, that was one factor, Your Honor, and as Mr. Nelson argued in his only brief, it's arguable and likely, since it was the only thing the trial court mentioned with any specificity, that it was the only factor in rendering its verdict. It was the only piece of evidence that the trial court discussed with any specificity. It mentioned that in broad strokes that it found both experts credible and it appreciated the testimony and the examination by counsel regarding those expert witnesses. It mentioned that it believed the state of Illinois had failed Mr. Nelson by previously cutting budgets to mental health services and perhaps in some greater world if we had had better access to mental health services, Mr. Nelson might not have been in this situation. But the only piece of evidence it discussed with even a passing glance of specificity is this one moment, this perhaps 30 seconds of the interview clip. The police officers say, hey, we ought to go outside for a second. Don't, you know, there's a camera running. Don't pick your nose. It's going to make you look kind of silly. And so Mr. Nelson turns to the camera and, yes, he picks his nose. He looks at the camera and he picks his nose. That is clearly a moment of defiance. But as we mentioned in the brief, the gulf between picking your nose because you want to perhaps give a bit of a side eye or a bit of resistance to police officers while you're in the middle of interrogation after having spent hours in a hospital, being taken directly from the hospital, not being given even the dignity of shoes or clothes, which is evident on the video. They took him directly out of the hospital. They wouldn't even give him clothes. He's in his bare feet in a hospital gown. It's pretty reasonable that somebody might say, okay, tell me not to pick my nose, maybe I'll do it. But that in no way is evidence that he in cold blood murdered Ellen Williams. And in no way, even if it is some evidence that he knew what he was doing, that this was a moment of resistance and defiance, it doesn't in no way counter the fact that, as noted in the exhibits, pages, I believe, 27 through 75, there's nearly two decades of mental health hospitalizations, averaging more than one per year for 13 years, where they mention auditory hallucinations, potential schizoaffective disorders on a number of ranges, self-harm, a fear of harm to others based on these mental health disorders. It does nothing to counter the lay witness testimony of the days beforehand from Sharnese Hicks and Renee Johnson, both of whom testified to Mr. Nelson's erratic behavior. And Sharnese Hicks, in particular, testified that because she and Mr. Nelson were staying together and she had schizophrenia, she believed that Mr. Nelson's actions were similar to her schizophrenia, and she did not want him living with her because she did not think that was a healthy situation for two people with active psychotic disorders to live together. His cousin, Renee Johnson, said that a few weeks before the shooting, Mr. Nelson was staying with her and he was uncharacteristically quiet and inactive with her children. Normally, he's a very boisterous and loving uncle. He wasn't eating much. He would wake up at night and tell her he was hearing voices on the train out as he was leaving. She said, please don't hurt yourself. Days before the shooting, he called her again. She said he was very upset. She said he's told her to put the Bible down, as we noted in the brief. References to specific religious moments without any prompting can be symptoms of delusion, especially when accompanied with evidence of a prior history of psychotic delusions and all of his bizarre actions that she noted. And the lay witness testimony on the day of the shooting shows that when Karen Conrad at My Time Day Spa testified that when Mr. Nelson came around, the state enlisted testimony that, yes, he was acting weird and people were put off by it. He was looking into the windows. People were concerned. Who's this guy loitering around our business in the place? I'm getting my nails done looking in here. I'm worried. On cross-examination, defense counsel enlisted testimony from Karen Conrad where she said, well, you know what, now that I think about it, I don't actually know that he was really looking at anybody. It looked like he had this sort of thousand-yard stare. He was looking past people. He wasn't actually looking at anyone. It kind of looked like he didn't know where he was. Jumping next to Cynthia Pratt and Stuart Mell, the house that he entered on Rose's, I believe it was Rose's Street. The state enlisted testimony, he was not welcome. He was not invited. He walked in anyways. The two elderly people who owned the house, Pratt and Mell, they were scared. He didn't leave until he was threatened with Pratt's German Shepherd. Again, trying to elicit this, he's running, he's scaring people, he's in this sort of criminal intent moment. Again, however, on cross-examination, defense counsel, living up to that burden of proof, the clear and convincing evidence to show that Mr. Nelson was legally insane at the time of the murder, got both Pratt and Mell to admit, actually, looked like he didn't know where he was. He wasn't asking us about a car, whether he could hide out, if they had a gun, whether they would hide a gun for him. What he asked us for was he walked in, looked kind of like he had no idea where he was, and he wanted, he asked us if he could have some food. And we told him to get out. We said, we don't want you here. We said, we're going to get our dog. And it took a minute, and he still kept asking about food, and he had this thousand-yard stare. But eventually he did leave. They said, we're going to get the dog. You've got to go. He left. But he didn't just walk out, walk away, and go away back on throughout the city. He walked out, and he stood at the bottom of their front step, and he stared at him for at least several seconds, enough so that Stuart Mell felt compelled to point out on cross-examination, when defense counsel asked him to do anything after you left your house, yeah, he stood there, and he stared at my front door. This wasn't just like a passive glance back, like, man, my chance to escape or hide got away. This was somebody clearly in the midst of a psychotic episode, in the middle of active delusions, did not know where they were, did not know what they were doing, did not know what they had done. They were, Mr. Nelson was grasping for any tether back to reality because he was clearly adrift in his psychosis. Turning it further to what the state would argue is active, persuasive, direct evidence of Mr. Nelson's flight, him running from the police. Now, I admit this looks bad at first glance. He is running from police. Ordinarily, that might be a chance to say if that's not flight, I don't know what is. But we are not dealing with somebody who pulled a gun on a 7-Eleven and in a moment of passion and is trying to run away knowing what they did was wrong. Mr. Nelson's history of psychotic delusions is noted in his, again, it's nearly two decades of mental health hospitalization records. He has audible and visual delusions. When Dr. Killian examined him, Mr. Nelson said that he believes he had a certain device put into the back of his hand called a V2K or a voice to kill that allows the Illuminati to send messages into his brain to direct him to kill people. So Mr. Nelson's specific psychotic delusions are not just don't be here, don't understand what's happening. His specific psychotic delusions are shadowy government agents run by a secret dark cabal are using you to murder people. You don't want to do this. These people are innocents, but you have no control. We're going to make you kill people. So the state in its response brief argues how could Mr. Nelson possibly say that his flight from police is in any way not indicative of flight or if it is somehow not indicative of flight, it was because it was a rational conclusion to which we noted in the reply brief, it is not indicative of flight and it is a rational conclusion within the delusional mind of Mr. Nelson who at the moment the police interact with him and he flees, has killed somebody as a result of his psychotic delusions, is wandering around town aimlessly looking for any way to get back to Earth to try and find a solid place to put his feet and come back to where he knows he is. And as he's in the midst of this delusion trying to find himself, find a way back to reality, here come police, the exact people whose delusions are telling him to kill, the exact people he's terrified of that he believes he is hearing in his head. So this evidence of flight is not only not evidence of flight, it is further evidence of his delusion. Of course he'd run. If he's been having nearly two decades worth of half his lifetime worth of the government arguably telling him to, at least in his own head, telling him to kill people and now he's got squad cars rolling up on him, find a good spot, I'd run too. I don't believe that's any evidence of flight or that he knew what he did at the time. And finally, I realize I only have a short amount of time left, but the experts, I understand that both, at least at the initial outset, were qualified to testify. Both are clinical psychiatrists and have degrees in advanced testing, but it's important to note that when comparing Dr. Killian's report and Dr. Cuneo's report, Dr. Cuneo's report can best be judged more by what it doesn't say and what it didn't do than what it did say and what it didn't do. As Dr. Cuneo noted, he failed to investigate and to incorporate several incredibly important pieces of evidence into his sanity report, including any notes taken while interviewing Mr. Nelson, any discussion of what he said or did on the day of the event, and also Dr. Cuneo's sanity report was largely copy-pasted from his fitness report. Fitness reports are about whether a defendant can assist in his defense. The sanity report is about the defendant's mental state at the time of trial. The circuit court had all this evidence, but as Your Honor noted, asked this, pointed out only this one point about picking his nose. The sheer weight of the evidence says that Mr. Nelson was legally insane at the time of his, that he killed Elton Williams. He met his burden of proof by clearing convincing evidence, and the circuit court's decision to find him guilty but mentally ill instead was against the manifest weight of that evidence. And so we would ask this court to correct Mr. Nelson's verdict to not guilty by reason of insanity. My time's almost up, but I'd be happy to answer any other questions Your Honors may have. No questions. Dr. Cuneo, you're not really questioning his qualifications or his report. You're saying Dr. Killian's report is better and more thorough. Is that accurate? Not really. Dr. Cuneo found him to be suffering from a mental illness. He just found that his mental illness did not meet the legal definition of insanity. No, Your Honor, correct that I'm not challenging his qualifications, but I am challenging the, I guess, yes, the ultimate conclusion of his report as well as the investigation and the analysis and the methods underpinning that conclusion. And in comparison to Dr. Killian's report, which is much more thorough, provides much more information, does avail itself of all the available evidence, which, as we argued in the opening brief, Dr. Cuneo's report did not. Comparing those two, Dr. Killian's report is more persuasive on the issue, should be taken more credibly, not to say that Dr. Cuneo's report should be thrown out, however taken for what it is and not as an equal counterpart to Dr. Killian's report. Thank you. Thank you, Your Honor. Thank you. Mr. Lennox, are you ready to proceed? Yes. If you would, please state your name for the record also for the recording. Absolutely. My name is Michael Lennox. Good morning, Attorney Feehlaw, Your Honors. I may please the Court. As I stated, my name is Michael Lennox and I represent the State in this matter. And I must say it's truly an honor to argue before you for the first time in person. This Court should affirm the defendant's first-degree murder conviction for two reasons. First, because the trial court did not find against the manifest weight of the evidence when it found the defendant appreciated the criminality of his conduct when he committed the crime. And second, though this sounds absurd, the trial court did not find the defendant guilty because he picked his nose. Your Honors, the standard of review in this case is manifest weight of the evidence. And in order for a finding to be contrary to the manifest weight of the evidence, an opposite conclusion must be clearly apparent. The analysis to determine whether a defendant understands the criminality of his conduct is comprised of four parts. One, credible expert testimony. Two, lay witness testimony. Three, the existence of a plan. And four, the methods of escape and prevention of detection. The opinion of an expert is of value only when it's based upon and in harmony with facts which are capable of verification by the court. Therefore, further, the trial effect may accept one expert's testimony over that of another, but the witness must be credible in his diagnosis. The trial effect may reject all expert testimony and conclude the defendant was sane based solely on lay testimony. Lay observations are especially relevant on the issue of the defendant's sanity at the time of the offense if they are based on observations made shortly before or after the crime was committed. The existence of a plan or design for the perpetration of the crime is one fact having particular relevance. And plans or methods of escape and prevention of detection or concealment of evidence of the crime are factors relevant to the determination of the defendant's insanity. Your Honors, before I go into the substance of my argument, I did want to reply briefly to the defendant's reply brief. Your Honors, in his oral argument, the defendant states that there is a shift in burden and that it is an affirmative defense that the defendant must show that he was insane at the time of the crime. However, in his reply brief on pages 17 and 18, after wading through a sea of excursions the defendant cast regarding the candor, my candor to the court, the defendant states, in relevant part, quote, the state's error and mischaracterizations in its response require Mr. Nelson to reiterate his original argument so that this issue before the court can be made clear and plain, unquote. The defendant states a number of points and then states, quote, as Mr. Nelson has consistently argued, the argument is that the overwhelming evidence at trial showed that Mr. Nelson was legally insane at the time he killed Elvin Williams. The state failed to overcome its burden to demonstrate that Mr. Nelson was sane and the circuit court ignored all the evidence to find Mr. Nelson guilty but mentally ill. The state, however, has no such burden, nor has it had a burden since 1984. The First District Appellate Court in Willowite states as such and cited to our Supreme Court in People v. Suford which stated the prosecution must prove the elements consisting an offense beyond reasonable doubt. When the defense of insanity is raised, however, there is no corresponding requirement that the prosecution disprove that claim by any quantum proof. Rather, under Illinois law, a defendant who raises a claim of insanity bears the burden of establishing that defense by preponderance of the evidence. Therefore, Your Honors, if this was, as the defendant states in his reply brief, the defendant's original argument that he had consistently argued, then the argument fails because it's no longer based in good law and it hasn't been good law for over 40 years. Moving to the expert opinions in regards to the defendant's reply brief again, the trial court found both expert witnesses to be credible. First, the factor of an expert opinion in a sanity analysis refers to an expert opinion, not solely the expert's report. The over-reliance on the latter pervades the defendant's analysis here in brief and in oral argument. And when given the opportunity to respond in his reply, he yet again failed to provide any legal authority establishing why this court must only compare the reports and not the overall opinions of each expert. The defendant conflates the doctor's report with their opinions, and while an opinion might include a report, an opinion is not only reports but also accompanying testimony. The issues the defendant asserts outside of the context of a comparison of reports regarding the expert opinion are sparse. Both doctors made assumptions from the lack of notes and the reports of the provided psychiatric hospitalizations about the voice-to-skull delusions and the Illuminati delusions. Both are plausible and both are based on their own experiences throughout their careers. Despite the defendant's assertion on page 5 of his reply, not only in the pages of the transcript between pages 349 and 361, does Dr. Cooney help, quote, admit that he never looked into certain items of evidence, unquote. In that same vein, referencing the defendant's reply brief in regards to lay witnesses, Your Honor, the lower court reviewed the lay testimony and afforded the proper weight. The defendant cites the testimony of Sharnice Hicks, a schizophrenic acquaintance of the defendant, Renee Johnson, the defendant's cousin, Cara Conrad, an employee of My Time Day Spa, and Stuart Mell, an occupant of the house the defendant entered after killing Eldon. Notably, none of the lay witnesses were eyewitnesses to the murder, and the first two had not seen the defendant for at least a couple days prior to the day of Eldon's murder. Both Sharnice and Renee detailed events that happened at least days prior and at most many years prior. Neither of their testimonies were based on observations made shortly before or after the occurrence of the crime, and really just established that the defendant suffers from mental illness, which is not in dispute. Further, though the defendant, in his reply, jests that I was treating mental health episodes as if they manifest as werewolf symptoms, I still think the context of the defendant's behavior is important here. Sharnice and Renee recounted his vast behavior happening at night, and the only violence that they recounted he inflicted was upon himself, which is, quite literally, night and day from our current case. The testimony from Cara Conrad was that she was, quote, looking into windows and asking to use patrons' phones. This is hardly indicative of murderous insanity. Finally, the testimony from Stuart Mell, whom the defendant states in his reply brief, quote, Mell explicitly stated that he never believed the defendant was hiding from something, citing pages 154 and 155. Your Honors, this never happened. That's absolutely false. The only mention on those two pages of Stuart, or with Stuart, is that he was asked if the defendant ever told him he needed to hide out in his house, to which he replied no. This in no way references what Stuart believed at the time. Further, the defendant on page, on the same page, 9 of his reply brief, stated the state also ignores any mention of the fact after Mr. Nelson left the home, he stared blankly at the front door for several minutes. He also states as much in his oral argument, and he cites the pages 150, 160, and 161. In the transcripts, this again is false. There is nothing in these pages of the records that states the defendant stood staring blankly for several minutes. Page 150 provides that the defendant did not leave right away until they got their dog, and pages 160 and 161 are just a general description of what happened without reference to the duration of time that he stood outside. The defendant fails to provide the testimony from the lay witness, Cynthia Pratt, that both her and Stuart were not only afraid, but that she personally felt that the defendant was running away from something. Your Honor, moving to my argument on expert opinions. First, regarding the expert opinions themselves, Dr. Cuneo stated that he believed the defendant should be found guilty but mentally ill, and Dr. Killian stated he believed the defendant was operating under severe psychosis. At the time of the murder, and could not appreciate the criminality of his conduct. This came after both doctors diagnosed the defendant, Dr. Cuneo while utilizing the most up-to-date version of the DSM, and Dr. Killian while utilizing an outdated version of the DSM, and outdated measures and language. Dr. Cuneo's primary diagnosis was that the defendant was malingering, but as Your Honor stated, his secondary diagnosis was that he had schizoaffective disorder, a depressive type. Dr. Killian diagnosed the defendant with probable schizoaffective disorder. Dr. Cuneo personally interviewed the defendant three times. Dr. Killian only did so once. Both experts based their opinion on the same evidence, and further, when comparing the psychologist's experience, published works, and accolades, Dr. Cuneo's dwarfs Dr. Killian's. These two psychologists are at least equally credible, but it certainly cannot be said that the opposite conclusion is clearly apparent, as is such to satisfy a manifesto of the evidence burden, to Dr. Cuneo's credibility. Further, our Supreme Court stated in Wilson v. Clark that an expert may give an opinion without disclosing the facts underlying the opinion. The expert may testify in terms of opinion or inference, and give his reasons, therefore, without prior disclosure of the underlying facts or data. Unless the court requires otherwise, the expert may, in any event, be required to disclose the underlying facts or data on cross-examination. And, Your Honors, finally, much of how Dr. Killian came to the conclusion of the defendant's insanity has no bearing or basis on or in legal standard for insanity, the legal standard for insanity. The first two factors he analyzed are the medical history of psychotic symptoms and improvement after medication, as the defendant also focuses on in his oral argument. And the insanity of a person, either before or after the commission of the crime, cannot excuse the crime. Only insanity existing at the very time of the crime can excuse the same, which is what the First District Appellate Court stated in People v. Dunnegan. The next two factors were the behaviors and statements on the day of the shooting. However, as the First District Court of Appeals in People v. Gilmore stated, a defendant may suffer from mental illness without being legally insane. It appears that Dr. Killian essentially created a false dichotomy here between being completely without mental illness and being legally insane. There is, of course, a middle ground, and that is that the defendant is mentally ill but was also able to appreciate the criminality of his conduct at the time of the crime. And the final two factors that Dr. Killian focused on were his interpretation of whether the defendant was malingering and whether there was a non-psychiatric explanation. As I stated in my brief, much of Dr. Killian's analysis, I believe, rests on information related by the defendant. And since self-serving or untruthful statements could affect the resultant diagnosis, this court should take that reliance into consideration. Further, whether a non-psychiatric explanation is available is really the issue before this court today. Your Honors, I see that my time is almost up. I would rest on my brief for the remainder of my arguments, but if Your Honors have any questions, I'd be happy to answer them. Questions?  Thank you, Your Honors. Mr. Steele, for rebuttal? Yes, Your Honors. Thank you. Mr. Steele. Your Honors, just three points briefly on rebuttal. Two will be very brief, and then my final point will be mostly about the discussion of the experts in this case. First, the State, in responding today to our reply brief, said that we argued that the State failed to disprove that Mr. Nelson was sane after he showed that he wasn't sane. I recognize that was in error to put that in the reply brief. I apologize. I would ask this Court to strike that statement, or I can file a motion to supplement the brief to strike that as well, but that was error. I concede it. The State does not have a burden to prove a defendant sane after he has met his burden to show himself insane. Second, the State gets pretty liberal about its proximity to the crime itself in relation to lay witness testimony, saying that the testimony of Sharnice Hicks and Rene Johnson a few days regarding Mr. Nelson's actions, a few days before the shooting, are their days before. Well, sure, their days. But it's the days directly leading up to the shooting in which he's having these psychiatric episodes, telling Rene Johnson to put the Bible down, slamming doors, telling Sharnice Hicks he's hearing voices, they're telling him to kill again. I'll leave it up to Your Honors to determine whether that is close in time enough to relate to whether Mr. Nelson was insane at the time he shot Eldon Williams. Finally, I'd like to discuss the State's response regarding the expert opinions and the expert reports in this case. The State says Dr. Killian interviewed Mr. Nelson three times. Dr. Killian only did it once. Sure. Two of those three interviews, again, as mentioned in my original time and in the opening brief and in the reply brief, were for fitness reports. And again, as I mentioned all those times, fitness reports serve a much different purpose than sanity reports. Fitness reports are about determining whether the defense counsel's bona fide doubts as to whether the defendant is fit for trial, meaning he can assist in his defense, and involves questioning the witness, the defendant, seeing whether he understands what's being said to him,  A sanity report is about what the defendant was thinking at the time he committed the crime. It involves a much greater discussion, analysis, and investigation of his mental health history, of his mental health at the time of the crime, of all the events surrounding that event, the commission of that crime, what led to it, any other possible non-psychiatric explanation, any possible psychiatric explanation. So the fact that Dr. Killian interviewed my client three times, two of those can, while not be discounted, can get a bit of a discount, right? Because they were for a very different purpose. And it actually works against the state because, as we argued and as we showed in the brief, Dr. Cuneo largely copy-pasted a lot of his analysis, his investigation, his evidence, and his conclusions from the fitness reports into his sanity report. And I would like to point your honors to the case of People v. Wilhoit from the 1st District, 1991, which says that the weight to be given an expert's opinion on sanity is measured by the reasons given for the conclusion and the factual details supporting it. The state argued in its time that an expert doesn't have to give a reason for his opinions. You can just have him. He's an expert. He has opinions. As long as they're not discounted by the defense, disproven, disqualified, whatever it is, he can give his opinion. The court can accept it. But where there are competing experts in this case, where we have alleged and shown that Dr. Cuneo failed to do a proper investigation, failed to follow up on the purpose of the sanity report instead of doing a fitness report plus type of thing, it must be taken into account for reasons given for his conclusion and the factual details supporting it, or, as I noted in my original time, the lack of factual details supporting it. Finally, just with a last moment, the state argues Dr. Cuneo has this very impressive resume, a long CV. No argument here. Dr. Cuneo has had a long, distinguished career. I would just note that this is largely a turnaround of the argument that the state accused Mr. Nelson of making, that the length of something means it's much more persuasive and important than the actual contents within it. We're not disputing that Dr. Cuneo is a qualified expert generally. We are disputing in this case that his conclusions were correct or that the circuit court was, the circuit court's verdict in finding Mr. Nelson guilty of mentally ill instead of not guilty by reason of insanity, we believe that was against the manifest way of the evidence. So I have a little bit of time left. If Your Honors have any questions, I'd be happy to answer those. No questions. All right. Thank you. Thank you, Your Honors. We appreciate your arguments and interest in the case. We will take the matter under advisement and issue a decision in due course. Thank you.